12 F.3d 215
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John WRIGHT; Kim Bennet; Larry Reid; and John D'Annunzio,
Defendants-Appellants.
 Nos. 91-2276, 91-2413, 92-2420, 92-1029.
 United States Court of Appeals, Sixth Circuit.
 Nov. 10, 1993.
 
 Before: KEITH and BOGGS, Circuit Judges; and GIBBONS, District Judge.*
 PER CURIAM:
 
 
 1
 This is a consolidated appeal by four defendants who were convicted of drug-trafficking crimes stemming from a marijuana distribution ring in Detroit, Michigan. A jury convicted John Wright of conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. Sec. 846; possession of marijuana with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1); money laundering, in violation of 18 U.S.C. Sec. 371; and engaging in monetary transactions from an illegal source, in violation of 18 U.S.C. Sec. 1957. Kim Bennet, Larry Reid, and John D'Annunzio were convicted of conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. Sec. 846. On appeal, the defendants raise claims of insufficient evidence, prejudicial joinder, erroneous jury instructions, prosecutorial misconduct, improperly admitted evidence, and misapplication of the United States Sentencing Guidelines. We reverse the conviction of D'Annunzio because it is not supported by sufficient evidence. We affirm the convictions of Reid, Wright, and Bennet.
 
 
 2
 * A
 
 
 3
 All defendants were allegedly part of a drug-trafficking conspiracy organized and managed by Michael Shandilis. Shandilis began the organization in 1985, and over the next five years arranged for the shipment of over 20,000 pounds of marijuana from Brian Ziener, his source of supply in Palm Desert, California. Ziener or Shandilis paid drivers to drive pick-up trucks loaded with 500 to 1000 pounds of marijuana from California to pre-arranged locations in the Detroit area. The marijuana was then transported from these locations to several houses, where it would be broken down from bale form, stored, and packed in heat-sealed packages for distribution. Shandilis and his runners distributed the packages on a credit basis to numerous retail suppliers. Shandilis stored the money at his house and in safes installed in his co-conspirators' houses. After a sufficient amount of money had been accumulated, the money would be shipped to Ziener in increments of $300,000 to $800,000.
 
 
 4
 In March 1989, 1040 pounds of marijuana was seized from a house at 1945 County Farm Road. In addition, over $160,000 in cash was seized from a safe in Shandilis's house. Shandilis testified at trial that at the time of the seizures, the organization had over 3,000 pounds stored in various locations in the Detroit area, with a wholesale value of over $3,000,000. According to Shandilis's ledgers, he was owed at least $3,300,000 from 18 different individuals for marijuana he distributed on consignment.
 
 
 5
 Shandilis executed a plea agreement under Rule 11, Fed.R.Crim.P., under which he agreed to plead guilty to two counts and to testify against his co-conspirators in exchange for the government dropping seven counts. The agreement stipulated that his maximum sentence would be twenty years.
 
 B
 
 6
 We briefly summarize each defendant's involvement in the conspiracy.
 
 
 7
 John Wright owned the property at 1945 County Farm Road, where 1040 pounds of marijuana was seized. Shandilis testified that he provided $60,000 of the $90,000 down payment on the property, with Wright providing the remainder, and that he provided money for Wright to make the monthly mortgage payments and pay the utilities. The government seized checks and utility bills from Wright that showed he paid the utilities from his personal checking account. Shandilis testified that he paid Wright between $20 and $30 for each pound of marijuana stored at his house. Other witnesses testified that Wright paid them between $100 and $300 per day to "babysit" or guard the marijuana when he was away.
 
 
 8
 Wright also participated in the conspiracy in other ways. Witnesses testified that Wright assisted Shandilis in drying out 3,000 pounds of marijuana in the basement of his house after it was discovered to be moldy; that he drove loads of marijuana, ranging from 400 to 700 pounds, from California and New York to Detroit; and that he made local deliveries to retail sellers in the Detroit area.
 
 
 9
 Kim Bennet, according to the testimony of Shandilis and others, stored marijuana in his home for the organization, delivered marijuana to various sellers, assisted Shandilis and Wright in drying the moldy marijuana, and collected money from various dealers. Also, Bennet was recorded on Shandilis's ledgers as having received marijuana on consignment.
 
 
 10
 Larry Reid, according to testimony of Shandilis and others, was a large-scale distributor of marijuana for the organization. The seized ledgers showed that "High" owed Shandilis $177,000 for marijuana already delivered on consignment. Shandilis testified that "High" is Reid's nickname; Reid is a salesman at Highland Appliance.
 
 
 11
 John D'Annunzio was a friend of John Wright. The government claimed that D'Annunzio was paid approximately $1,000 to babysit the marijuana at 1945 County Farm on Thanksgiving weekend in 1988. The government also claimed that D'Annunzio assisted Wright on more than one occasion when Wright delivered marijuana to John DeBono, a dealer who pled guilty and testified as a witness for the government.
 
 II
 
 12
 D'Annunzio, Reid, and Bennet each claim prejudicial joinder. None of the defendants raised this issue during trial, and no one moved for severance at the close of the government's case or at the close of all the evidence. Therefore, the issue is waived and can not be reviewed by this court absent a manifest miscarriage of justice. United States v. Patrick, 965 F.2d 1390, 1400 (6th Cir.), cert. denied, 113 S.Ct. 376, 1378 (1992).
 
 
 13
 In general, parties who are jointly indicted are tried together. In order to escape this general rule, the defendants "must carry the 'heavy burden of showing specific and compelling prejudice resulting from a joint trial which can be rectified only by separate trials.' " United States v. Davis, 809 F.2d 1194, 1207 (6th Cir.) (quoting United States v. Dempsey, 733 F.2d 392, 398 (6th Cir.1984)), cert. denied, 483 U.S. 1007 (1987).
 
 
 14
 The defendants were named in an eight-count indictment, involving fifteen defendants. All fifteen defendants were named in Count One. Of the four defendants who went to trial, only Bennet and Wright were named in Count Two, and only Wright was named in Counts Three through Five. Shandilis, who pled guilty, was the only defendant named in Counts Six through Eight.
 
 
 15
 D'Annunzio, Reid, and Bennet contend that they were prejudiced by being included in the same trial as John Wright, who was named in additional and more complex counts, including money-laundering. However, they have made only general and conclusory arguments. They have not shown any specific prejudice, nor have they shown that the jury heard any evidence that would have been inadmissible if the trials were conducted separately. Accordingly, we find no compelling prejudice resulting from the joint trial.
 
 III
 
 16
 D'Annunzio and Reid contend that there was insufficient evidence to support their jury convictions of conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. Sec. 846. In effect, the defendants are asking us to second-guess the jury and thus face a "very heavy" burden. United States v. Vannerson, 786 F.2d 221, 225 (6th Cir.), cert. denied, 476 U.S. 1123 (1986). The question before us is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence ... even if the evidence is circumstantial." United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984), cert. denied, 467 U.S. 1193 (1985).
 
 
 17
 To prove a conspiracy under 21 U.S.C. Sec. 846, the government must prove the existence of an agreement to violate the drug laws and that each defendant knew of and participated in the conspiracy. United States v. Pearce, 912 F.2d 159, 161 (6th Cir.1990), cert. denied, 498 U.S. 1093 (1991). The government need not prove a formal agreement: "a tacit or material understanding among the parties is sufficient to show a conspiracy." Ibid. An overt act need not be proven, and circumstantial evidence can be sufficient to support a conviction. United States v. Dempsey, 733 F.2d 392, 396 (6th Cir.), cert. denied, 469 U.S. 983 (1984).
 
 
 18
 Despite this heavy burden, we hold that there is insufficient evidence to support D'Annunzio's conviction. The government's case against D'Annunzio is based on two different activities. First, the government claims that D'Annunzio guarded the marijuana at 1945 County Farm on Thanksgiving weekend in 1988, in exchange for approximately $1,000. D'Annunzio admitted that he "housesat" at 1945 County Farm that weekend, but denied any knowledge that marijuana was in the basement, denied being paid, and denied any knowledge of the conspiracy. The key witnesses against D'Annunzio were Michael Shandilis, the organizer of the conspiracy, and David Hampton, a frequent babysitter, or guard, at 1945 County Farm. Shandilis never spoke with D'Annunzio about the housesitting. He testified that he "believed" that D'Annunzio was to be paid for the housesitting, but that he did not pay D'Annunzio himself. Hampton testified that he was at the house when D'Annunzio arrived for the weekend. Hampton testified that he never discussed the marijuana with D'Annunzio, and he only spoke with D'Annunzio briefly before leaving, encouraging him to make himself at home. In sum, Hampton's testimony confirms only what D'Annunzio freely admitted--that D'Annunzio was present at the house on Thanksgiving weekend, 1988.
 
 
 19
 The only direct evidence that D'Annunzio knew or must have known that there was approximately 1,000 pounds of marijuana in the basement is testimony about the smell. An officer who participated in a raid on the house over four months later claimed that he encountered an "overpowering" smell of marijuana as soon as he entered the house. Hampton testified that around Thanksgiving of 1988, when D'Annunzio was in the Country Farm house, he could smell the marijuana in the house, but admitted that "you couldn't smell it too much upstairs." D'Annunzio claimed that he did not smell the marijuana because he had a cold and was on strong medication. The government presented no evidence that D'Annunzio went into or near the part of the house where the marijuana was stored.
 
 
 20
 The government's second basis for charging D'Annunzio involved testimony from John DeBono who had received immunity for his cooperation. DeBono testified that, on two to six occasions, D'Annunzio accompanied Wright when Wright made deliveries of marijuana to DeBono's house. DeBono claimed that Wright would deliver the marijuana in five to ten pound lots and would pick up bundles of cash wrapped in rubber bands. However, DeBono testified that he and Wright always went into another room to execute the deal because DeBono did not know D'Annunzio well enough to trust him. After the transactions were completed, DeBono claimed that he, Wright, and D'Annunzio would smoke marijuana socially. Despite the cooperation of this key witness, the government presented no evidence that D'Annunzio ever saw any money or marijuana (other than the small amount smoked socially) or that the conspiracy or any drug deals were ever discussed in D'Annunzio's presence.
 
 
 21
 It is well-established that " 'mere association with conspirators is not enough to establish participation in a conspiracy.' " United States v. Pearce, 912 F.2d at 162 (quoting United States v. Stanley, 765 F.2d 1224, 1243 (5th Cir.1985)). The government presented no evidence that D'Annunzio knew about the drug deals that Wright and DeBono committed behind closed doors, much less that D'Annunzio agreed to participate in these deals or join a larger conspiracy. Furthermore, the government presented little evidence that D'Annunzio knew about, joined, and participated in the conspiracy simply by being present at 1945 County Farm over Thanksgiving weekend in 1988. The slim circumstantial evidence consisted only of: 1) testimony that others could smell raw marijuana in parts of the house, 2) Shandilis's belief or assumption that D'Annunzio was paid approximately $1,000 by someone else, and 3) the fact that other people were often paid to babysit the marijuana. From this evidence, the jury had to infer that D'Annunzio knew that marijuana was in the house and from that knowledge the jury had to infer that D'Annunzio agreed to stay with the marijuana in order to promote the drug conspiracy.
 
 
 22
 Even if the jury believed all of the testimony of the government witnesses, there is no evidence to support D'Annunzio's conviction for conspiracy. Shandilis stated that he thought or assumed someone paid D'Annunzio. He provided no explanation for the basis of this belief. Hampton testified that he saw D'Annunzio housesitting and that housesitters were often paid large amounts of money to "babysit" the marijuana. However, he provided no evidence that D'Annunzio was paid, that D'Annunzio knew about the marijuana, or that D'Annunzio in any way acted differently than an inculpable housesitter. Finally, there is the evidence of the smell--the only evidence that provides a basis for a finding that D'Annunzio knew marijuana was in the house.
 
 
 23
 The smell of marijuana is certainly relevant evidence, and courts have pointed to the smell as evidence that the presence of marijuana was obvious. See, e.g., United States v. Ashby, 864 F.2d 690 (10th Cir.1988), cert. denied, 494 U.S. 1070 (1990) (evidence supporting giving of "deliberate ignorance" instruction included smell of burnt marijuana in car defendant was driving, smell of raw marijuana emanating from trunk, marijuana seeds in floor and ashtray, and dubious claim of defendant that he did not have a key to the trunk); United States v. Glenn, 828 F.2d 855 (1st Cir.1987) (conspiracy defendant helped unload cargo in the middle of the night with strong smell of marijuana and was present during discussion of conspiracy; co-conspirators were paid with duffle bags full of marijuana in his presence); Machin v. Wainwright, 758 F.2d 1431 (11th Cir.1985) (defendant, who was caught in back of truck three feet from 600 pounds of marijuana that he could see and smell, told a co-defendant "silencio" when he was being questioned by the police); United States v. Martinez, 700 F.2d 1358 (11th Cir.1983) (conspiracy defendant was crewman on seventy-five foot shrimping vessel with over 26,000 pounds of marijuana; Coast Guard personnel could smell marijuana as they boarded; captain claimed there was no cargo and gave inconsistent answers about crew and registration). However, the instant case is distinguishable because the smell of marijuana is the only evidence offered to prove that D'Annunzio knew marijuana was in the house when he housesat. The multiple inferences in this case from the smell of marijuana alone are impermissible. As the Fifth Circuit has aptly stated: "It is not enough for [the evidence] merely to establish a climate of activity that reeks of something foul." United States v. Wieschenberg, 604 F.2d 326, 332 (5th Cir.1979).
 
 
 24
 D'Annunzio's presence at 1945 County Farm and his association with Wright constitute evidence that supports the beginning of an investigation, not the beginning of a prison sentence. The evidence may support an inference that D'Annunzio knew that a drug conspiracy existed. The evidence clearly does not support an inference that D'Annunzio intentionally joined and participated in the drug conspiracy. Although we respect the role of the jury, we also recognize that juries make mistakes. See United States v. Pearce, 912 F.2d at 162 (defendant's presence in crack house near two guns when the house was raided did not support theory that he was a lookout for drug conspiracy); United States v. McIntyre, 836 F.2d 467, 471-72 (10th Cir.1987) (evidence that defendant twice bought cocaine from conspirators to share with friends insufficient to support conspiracy conviction); United States v. Gordon, 712 F.2d 110, 114-15 (5th Cir.1983) (evidence that defendant was driving truck with sixty pounds of marijuana in hidden compartment and claimed he had been fishing even though no fishing gear was found in the truck insufficient to support conspiracy conviction); United States v. Evans, 970 F.2d 663, 673-74 (10th Cir.1992), cert. denied, 113 S.Ct. 1288 (1993) (evidence that defendant purchased crack cocaine once with no evidence of resale and that defendant loaned scales to conspirators insufficient to support conspiracy conviction).
 
 
 25
 The risk of an erroneous conviction is heightened in trials with multiple defendants charged in complex conspiracies involving millions of dollars worth of drugs. The Tenth Circuit recognized this problem recently, with this admonition:
 
 
 26
 "[This] erroneous conviction serves as a reminder that we must be particularly vigilant when the government seeks to bring many individuals under the umbrella of a single conspiracy. The risk is that a jury will be so overwhelmed with evidence of wrongdoing by other alleged coconspirators that it will fail to differentiate among particular defendants. The government must not be allowed to use conspiracy as a tool to circumvent the fundamental principle that " '[g]uilt with us remains individual and personal.... It is not a matter of mass application.' "
 
 
 27
 United States v. Evans, 970 F.2d at 674 (quoting Kotteakos v. United States, 328 U.S. 750, 772 (1946)). Although there is ample evidence of a conspiracy, there is insufficient evidence that D'Annunzio intentionally joined and participated in the conspiracy. Accordingly, we reverse D'Annunzio's conviction.[1]
 
 
 28
 On the other hand, we find that sufficient evidence supports Reid's conviction. Shandilis's testimony alone provided sufficient evidence for a reasonable jury to find that Reid had intentionally participated in the drug conspiracy beyond a reasonable doubt. Shandilis testified that Reid had sold large amounts of marijuana for him for a long period of time. Furthermore, Shandilis testified that, at the time of the police raids, Reid owed him approximately $177,000 for marijuana that Shandilis had delivered to Reid. Ledgers found at Shandilis's home confirmed that a person named "High" owed Shandilis $177,000, and Shandilis explained that "High" was Reid's nickname because he worked at Highland Appliances. The telephone number for "High" in Shandilis's telephone book matched Reid's telephone number. Thus, according to Shandilis, Reid was a major player in the drug conspiracy. Reid denied any knowledge of or participation in the drug conspiracy. The jury evidently believed Shandilis. Since credibility determinations are the province of the jury. United States v. Dunigan, 884 F.2d 1010, 1013 (7th Cir.1989), we will not disturb the jury's conviction of Reid.
 
 IV
 
 29
 The defendants object to two of the jury instructions provided by the district court. First, D'Annunzio, Bennet, and Reid objected to the jury instruction on deliberate ignorance. The Sixth Circuit has stated that similar instructions on deliberate ignorance are permissible, when otherwise warranted, insofar as they make clear that the instruction does not authorize a conviction on simple negligence. United States v. Lawson, 780 F.2d 535, 542 (6th Cir.1985); United States v. Holloway, 731 F.2d 378, 380-81 (6th Cir.), cert. denied, 469 U.S. 1021 (1984); United States v. Gullett, 713 F.2d 1203, 1212 (6th Cir.1983), cert. denied, 464 U.S. 1069 (1984). Here, however, the defendants do not challenge the instruction itself, but rather the appropriateness of the instruction in this context. Although Bennet and Reid joined D'Annunzio in this argument, this argument is only relevant to D'Annunzio. D'Annunzio is the only defendant who claimed that although he may have committed an act--babysitting the marijuana--that furthered the conspiracy, he was ignorant of the existence of the conspiracy and the consequences of his act. Because we find that there is insufficient evidence to support D'Annunzio's conviction, there is no need to address this issue.
 
 
 30
 D'Annunzio, joined by the other defendants, also objected to the following instruction on proving state of mind:
 
 
 31
 But a defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the defendant said, what the defendant did, how he acted, and any other facts and circumstances in evidence that show his state of mind.
 
 
 32
 You may also consider the natural and probable consequences of acts that he or they knowingly did or did not do, and whether it is reasonable to conclude that he intended those results. This, of course, is all for you to decide.
 
 
 33
 This instruction comes from the Sixth Circuit's Pattern Criminal Jury Instructions Sec. 2.08, and a similar instruction has been previously approved by this court in United States v. Reeves, 594 F.2d 536, 541 (6th Cir.), cert. denied, 442 U.S. 946 (1979). The defendants argue that the instruction unfairly shifts the burden of proof to the defendants, citing Francis v. Franklin, 471 U.S. 307 (1985); but this instruction can be distinguished from the instruction in that case. In Francis v. Franklin, the instruction included the following statements: "The acts of a person of sound mind and discretion are presumed to be a product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted." Id. at 311 (emphasis added). The Court held that the instruction was improper because it was couched in the form of a command and thus a reasonable juror could have understood it to be mandatory. Id. at 316. In this case, the instruction creates only a permissive, and not a mandatory, inference. The jury is only told to "consider" the consequences, and told that it is free to decide "whether" the defendant intended the result. Therefore the instruction was appropriate.
 
 V
 
 34
 The government read into evidence testimony John Wright gave at the trial for civil forfeiture of 1945 County Farm. In this testimony, Wright asserted that he had only met Shandilis once, that he rented the house at 1945 County Farm to two individuals that he did not know well, that there was no rental agreement and all rent was paid in cash, and that the renters disappeared after the police searched the house in March 1989.
 
 
 35
 Wright objected to the reading of the testimony at trial on relevancy grounds and now objects on the ground that it is hearsay. The testimony is not hearsay because it is a statement of a party as defined under Federal Rule of Evidence 801(d)(2). The statement is relevant because the government used it to show that Wright fabricated evidence in order to hide his guilt. See United States v. Mendez-Ortiz, 810 F.2d 76, 77-79 (6th Cir.1986), cert. denied, 480 U.S. 922 (1987).
 
 VI
 
 36
 Both Wright and Reid argue that the district court erred in calculating the quantity of marijuana for which they should be held responsible for the purposes of sentencing under the United States Sentencing Guidelines. In conspiracy convictions, a defendant is accountable under the Sentencing Guidelines for the criminal activity of co-conspirators of which the defendant knew or should have known. U.S.S.G. Sec. 1B1.3, comment. (n. 1). Therefore, in a drug conspiracy, "the entire quantity of [drugs] attributable to a distribution enterprise is included in determining the base offense level of a conspirator." United States v. Blankenship, 954 F.2d 1224, 1228 (6th Cir.1992). However, this circuit has stated that courts must approach the calculation of drug quantities with caution and must not "hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." United States v. Walton, 908 F.2d 1289, 1303 (6th Cir.1990) (emphasis in original).
 
 
 37
 We hold that the district court properly calculated both defendants' drug quantities. John Wright was held responsible for 3,000 to 10,000 kilograms of marijuana and thus assigned a base offense level of 34. The entire conspiracy involved 20,000 pounds of marijuana over a five-year period. At the time of the arrests, 3,000 pounds of marijuana was in storage in Detroit, and 3,000 pounds of marijuana had been delivered to dealers on consignment. John Wright helped store the marijuana, drove at least one load from California to Detroit, and helped recruit and schedule people to guard the marijuana at 1945 County Farm. When the house was raided on March 21, 1989, 1040 pounds of marijuana was found in the basement. Shandilis testified that as much as 3,000 pounds had been stored in the house at one time. Shandilis also testified that Wright drove a 1310-pound load of marijuana from California to Detroit. The district court found that Shandilis had paid Wright $40,000 for storing the marijuana and owed him an additional $75,000 to $100,000. Therefore, Shandilis paid Wright at least $115,000 in storage fees at a rate of $20 per pound. From this, the court calculated that Wright stored a minimum of 5,750 pounds of marijuana. When this amount is added to the 1,310 pounds that Wright transported from California, then Wright can be held responsible for at least 7,060 pounds or 3,202 kilograms of marijuana. Therefore, we will not disturb the district court's finding that Wright should be held responsible for a minimum of 3,000 kilograms of marijuana.
 
 
 38
 Reid was sentenced on the basis that he knew or should have known about 1,080 to 1,560 pounds of marijuana. Shandilis described Reid as one of his larger dealers and claimed that Reid owed him $177,000 for delivered marijuana at the time of the police raid. Shandilis testified that he delivered marijuana to Reid in large amounts of one hundred pounds or more and that Reid knew that Shandilis had other dealers working for him. The court explained its calculations as follows:
 
 
 39
 "The investigation here by the Probation Department revealed that Larry Reid acquired marijuana from Michael Shandilis throughout the 1988 calendar year...."
 
 
 40
 * * *
 
 
 41
 He initially acquired amounts of ten to 30 pounds; shortly after, he began to acquire 80 to 100 pound amounts. The defendant acquired amounts of marijuana twice monthly. Giving the defendant the 'benefit of the doubt,' we can assume that for the first six-month period, the defendant acquired 120 to pounds of marijuana. The next six months the defendant would have acquired 960 to 1,200 pounds of marijuana. Therefore, 1,080 pounds of marijuana would be the least attributed to the defendant, and 1,560 would be the maximum."
 
 
 42
 For the purposes of this [calculation], the Court is willing to assume that it was the smaller amount, but it certainly could not have been much, if anything, less than that.
 
 
 43
 We find that these calculations are supported by a preponderance of the evidence.
 
 
 44
 Wright also argues that the district court's finding that he was a leader, manager, supervisor, or organizer was not based on a preponderance of the evidence. The Guidelines allow the court to add two levels to the base offense level if the defendant was a leader, manager, supervisor, or organizer. U.S.S.G. Sec. 3B1.1(c); United States v. Silverman, 889 F.2d 1531, 1540 (6th Cir.1989). The court may consider factors such as the defendant's "exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, ... and the degree of control and authority exercised over others." Id. at comment. (n. 3).
 
 
 45
 We disagree with Wright's contention. Both Shandilis and Hampton testified that Wright recruited people to babysit the house at 1945 County Farm. Also, witnesses testified that Wright recruited DeBono and Heinlen to sell marijuana for Shandilis and arranged the introductions. Finally, Wright arranged for Richard Lavigne to be the nominal owner of property in California in an effort to launder the illegal drug proceeds.
 
 VII
 
 46
 For the foregoing reasons, we REVERSE the jury conviction of John D'Annunzio and AFFIRM the jury convictions of John Wright, Kim Bennet, and Larry Reid.
 
 
 
 *
 The Honorable Julia S. Gibbons, United States District Judge for the Western District of Tennessee, sitting by designation
 
 
 [1]
 Because we reverse the jury conviction on the ground of insufficient evidence, we do not address D'Annunzio's arguments concerning prosecutorial misconduct and inadmissible evidence