**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jesus J. LOPEZ–GUTIERREZ,**
**Defendant–Appellant.**

**No. 94–3292.**

United States Court of Appeals,
Tenth Circuit.

May 7, 1996.

Daniel E. Monnat of Monnat & Spurrier, Wichita, Kansas, for Defendant/Appellant.

Randy M. Hendershot, Office of the United States Attorney, Topeka, Kansas (Randall K. Rathbun, United States Attorney, and D.

Blair Watson, Assistant United States Attorney, on the brief), for Plaintiff/Appellee.

Before EBEL, LOGAN, and BRISCOE, Circuit Judges.

EBEL, Circuit Judge.

Defendant–Appellant Jesus J. Lopez–Gutierrez ("Lopez–Gutierrez") was convicted of conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Lopez–Gutierrez appeals his conviction arguing: (1) the government presented insufficient evidence at trial; (2) the grand jury's independence was unconstitutionally usurped; (3) Federal Rule of Evidence 404(b) evidence was improperly admitted; (4) hearsay evidence was improperly admitted as coconspirator non-hearsay; (5) his sentence was improperly enhanced; and (6) the cumulative effect of the alleged errors at trial warrant reversal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and uphold Lopez–Gutierrez' conviction and sentence.

## BACKGROUND

In early February, 1994, the Drug Enforcement Administration ("DEA") believed Jose Avila ("Avila") was distributing cocaine in the Wichita, Kansas area. As a result, the DEA began an investigation into Avila's activities and, through a confidential informant ("CI"), set up a number of monitored contacts with Avila which resulted in his arrest. Information revealed during these monitored contacts with Avila also led DEA agents to believe Lopez–Gutierrez was Avila's cocaine source.

During the series of monitored contacts between the CI and Avila, Avila revealed that his source resided in Garden City, Kansas, and that his source had the ability and willingness to provide ten to fifteen ounces of cocaine per week at $950 per ounce for resale. Avila also stated that the wife of his source was being treated at a Wichita hospital and that his source could bring a negotiated quantity of cocaine to Wichita when he came to visit his wife. During the last moni-

tored contact between the CI and Avila, when the two were to consummate a previously negotiated cocaine deal, Avila stated that he had just returned from Garden City and was willing to "front" the CI the negotiated twenty ounces of cocaine. After providing the CI with twenty ounces of cocaine, Avila was arrested.

Avila identified Lopez–Gutierrez as his source and agreed to cooperate with the DEA agents by contacting Lopez–Gutierrez by telephone. Before placing the calls, Avila asked the agents to return to his residence in order to retrieve a business card containing the telephone number of his cocaine source. The card contained the name "Jesus" and a telephone number that Lopez–Gutierrez had listed as his home number at his place of employment.

Between the hours of 5:00 a.m. and 5:35 a.m. on February 12, 1994, the DEA agents placed two phone calls to Lopez–Gutierrez using the number found on the business card retrieved from Avila's home.[1] On both occasions Avila engaged in a conversation with an individual that Avila and the DEA agents believed to be Lopez–Gutierrez.

Prior to placing the first call, the DEA agents instructed Avila to tell Lopez–Gutierrez that he had a buyer for twenty ounces of cocaine, but that the buyer was only willing to pay $700 per ounce. Lopez–Gutierrez indicated that the amount was not enough, but nevertheless instructed Avila to travel to Garden City regardless of the outcome of the $700 an ounce deal. During the same conversation, Lopez–Gutierrez asked Avila if he would have "buyers."

Prior to making the second call, the DEA agents instructed Avila to tell Lopez–Gutierrez that the buyer would agree to pay $850 an ounce for the twenty ounces of cocaine. During the conversation Avila requested that the cocaine be delivered to Greensburg, Kansas. Greensburg is approximately halfway between Wichita and Garden City. Lopez–Gutierrez stated that he could not go to Greensburg and that Avila should meet him

---

1. The calls were recorded. Because the conversations were in Spanish, translated versions were provided to the jury.

outside his job at approximately 11:00 a.m. that morning. Avila then asked, "20 huh?," and Lopez–Gutierrez said, "Yes."

Based upon these conversations, the DEA agents and Avila traveled to the Monfort Meat Packing Company in Garden City, Kansas, where they believed Lopez–Gutierrez worked.[2] Lopez–Gutierrez did not arrive until approximately 5:30 p.m. At that time he was driving a Jeep and was accompanied by two other individuals. Avila walked over to the Jeep and engaged in a brief conversation with Lopez–Gutierrez.[3] Lopez–Gutierrez then drove away. He was later arrested by DEA agents in downtown Garden City. No drugs were found on Lopez–Gutierrez or his passenger at the time of his arrest, nor were any found in his vehicle.

Lopez–Gutierrez was charged with one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and one count of unlawful distribution of twenty ounces of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. After a four day jury trial, the jury returned a guilty verdict as to Count I, conspiracy to distribute cocaine, and a verdict of not guilty as to Count II, distribution of cocaine. Counsel for Lopez–Gutierrez filed a Motion For Judgment Of Acquittal, Or In The Alternative, For New Trial. The district court denied this motion and sentenced Lopez–Gutierrez to one hundred twenty months imprisonment followed by eight years of supervised release.[4]

Lopez–Gutierrez now appeals his conviction for conspiracy to distribute cocaine, arguing insufficient evidence was presented at trial, as well as other errors which, as discussed below, he contends warrant the reversal of his conviction and sentence.

---

**2.** The custodian of records for Monfort Meat, Debbie McGranahan, testified that Lopez–Gutierrez was an employee of the plant and that he had worked from approximately 6:45 a.m. to 10:45 a.m. on February 12, the day he planned to meet Avila at 11:00 a.m.

**3.** The tape recorder used during this meeting failed and the conversation was not recorded. After Lopez–Gutierrez' arrest, Avila decided not

## ANALYSIS

### I. EVIDENCE AT TRIAL

#### A.

#### Rule 404(b) Evidence

Lopez–Gutierrez contends that the district court improperly allowed the government to present Rule 404(b) evidence of a previous uncharged marijuana distribution which it did not reveal to defense counsel until after the start of trial. He argues that the late disclosure impaired his ability to object to the admission of the evidence and to cross-examine the relevant witness at trial. We review the district court's decision to admit Rule 404(b) evidence under an abuse of discretion standard. *United States v. Massey*, 48 F.3d 1560, 1571 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2628, 132 L.Ed.2d 868 (1995).

Fed.R.Evid. 404(b) renders inadmissible evidence of prior bad acts to prove the character of a person in order to show action in conformity therewith. This evidence, however, is admissible for other purposes, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In 1991, the rule was amended to include a reasonable notice requirement in criminal cases. The rule now permits evidence of prior bad acts to be admitted

> provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

The trial in this case began on May 17, 1994. Lopez–Gutierrez filed a motion for

---

to cooperate further with law enforcement officials and therefore did not provide any information relative to this conversation with Lopez–Gutierrez. *See* Presentence Report at 5.

**4.** Lopez–Gutierrez was further ordered to be turned over to the Immigration and Naturalization Service for deportation upon his release from imprisonment.

discovery of Rule 404(b) evidence on April 15, 1994, and the government responded on April 22, 1994. The government indicated in its response that it intended to offer evidence of Lopez–Gutierrez' prior Kansas state felony convictions for drug violations. Later, however, during a pretrial motions hearing held on May 2, 1994, the government informed Lopez–Gutierrez that it was investigating two uncharged drug distributions made by him. After further investigation, on May 12, 1994, the government notified Lopez–Gutierrez and the district court of its intent to offer evidence that a Terry Vasquez ("Vasquez"), who had been arrested in November of 1993 and charged with the sale of marijuana and cocaine in two separate transactions, claimed his cocaine source was Lopez–Gutierrez. In a subsequent pretrial Rule 404(b) hearing, the district court ruled that the evidence concerning the November cocaine distribution was admissible. Lopez–Gutierrez does not challenge this ruling on appeal.

On the first day of trial, however, after the jury had been selected, the government informed the court and Lopez–Gutierrez of its desire to offer further evidence that Vasquez claimed Lopez–Gutierrez was also his marijuana source. The government first learned of this information the day before trial. Lopez–Gutierrez objected that the evidence should not be admitted because the government failed to provide pretrial notice under Rule 404(b). The district court overruled the objection and ruled that the evidence was admissible. On appeal, Lopez–Gutierrez argues that the evidence should not have been admitted because he was not given "reasonable notice" of the evidence before trial. He further argues that the late disclosure impaired his ability to object to the evidence and to cross-examine Vasquez at trial.

If the government does not comply with the notice requirement of Rule 404(b) after a request by the accused, the offered evidence is inadmissible. *See* Fed.R.Evid. 404 advisory committee's note ("[T]he notice requirement serves as condition precedent to admissibility of 404(b) evidence."). However, where Rule 404(b) evidence is offered during trial, as it was in the instant case, the district court may excuse pretrial notice and admit such evidence on good cause shown. *See* Fed.R.Evid. 404(b). This is what the district court did. The district court held that because the evidence was not made available to the government until the night before trial during an interview with Vasquez, there was good cause to excuse the pretrial notice requirement. We agree.

In an effort to offset any prejudice to Lopez–Gutierrez resulting from the admission of this evidence, the district court ordered that Vasquez be made available to Lopez–Gutierrez prior to allowing this evidence before the jury. In addition, before Vasquez testified, the government provided to Lopez–Gutierrez a copy of the investigative reports surrounding the marijuana distribution and gave Lopez–Gutierrez access to a tape recording of the marijuana transaction.

We conclude that under these circumstances Lopez–Gutierrez was able effectively to cross-examine Vasquez as to his testimony regarding the prior marijuana transaction with Lopez–Gutierrez, and we hold that the district court did not abuse its discretion by admitting this 404(b) evidence.

## B.

### Hearsay Evidence

Lopez–Gutierrez argues that the district court erred by admitting recordings and distributing transcripts to the jury of the six monitored contacts between Avila and the confidential informant. At trial, Lopez–Gutierrez objected to this evidence on the basis that it was inadmissible hearsay. The district court, however, admitted the evidence under the coconspirator non-hearsay exception to the hearsay rule, Federal Rule of Evidence 801(d)(2)(E).[5]

5. Fed.R.Evid. 801 provides, in pertinent part, as follows:

(d) **Statements which are not hearsay.** A statement is not hearsay if—...

(2) **Admission by party-opponent.** The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

We have established a three-part test for determining the admissibility of coconspirator hearsay evidence under Rule 801(d)(2)(E). The court must determine by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the defendant were members of the conspiracy; and (3) the hearsay statements were made in the course of and in furtherance of the conspiracy. *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir.), *cert. denied,* ⸺ U.S. ⸺, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994). In making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with independent evidence tending to establish the conspiracy. *Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2781–82, 97 L.Ed.2d 144 (1987); *United States v. Hernandez,* 829 F.2d 988, 993 (10th Cir.1987) (the hearsay statements themselves may serve as "at least a partial basis for the findings necessary to admit the statements into evidence"), *cert. denied,* 485 U.S. 1013, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988).

The Supreme Court in *Bourjaily* left open the question whether a trial court could rely solely on the coconspirator statements the government seeks to admit in order to find a predicate conspiracy. *Bourjaily,* 483 U.S. at 181, 107 S.Ct. at 2781–82. We, however, have determined that under *Bourjaily,* "there need only be some independent evidence linking the defendant to the conspiracy." *United States v. Martinez,* 825 F.2d 1451, 1453 (10th Cir.1987). Such independent evidence may be sufficient even when it is not "substantial." *United States v. Rascon,* 8 F.3d 1537, 1541 (10th Cir.1993). We have defined "independent evidence" as "evidence other than the proffered [coconspirator] statements themselves." *Martinez,* 825 F.2d at 1451. More recently, in *United States v. Owens,* 70 F.3d 1118, 1125 (10th Cir.1995), we held that the summary testimony of a government agent regarding other out of court detailed factual statements made by a coconspirator to the agent during an investigation was independent evidence.

Lopez–Gutierrez first argues that the district court erred by relying solely on the hearsay statements contained in the disputed tapes themselves in making its preliminary determination that a conspiracy existed, and by not following the preferred order of proof prior to admitting the coconspirator statements. We review the district court's findings of fact made in support of the admission of hearsay statements under the clearly erroneous standard. *Urena,* 27 F.3d at 1490. Review of the record reveals that Lopez–Gutierrez' contentions are based upon a misinterpretation of the district court's findings.

We have held that the preferred order of proof in determining the admissibility of coconspirator statements is first for the district court to hold a *James* hearing, *see generally United States v. James,* 590 F.2d 575 (5th Cir.) (*en banc*), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), "outside the presence of the jury to determine by a preponderance of the evidence the existence of a predicate conspiracy." *Urena,* 27 F.3d at 1491. The district court in this case held a pretrial *James* hearing on May 18, 1994 to determine the admissibility of the tape recorded conversations between Avila and the CI. The district court stated that the Avila–CI tapes were "clearly hearsay," but that the statements allegedly made by Avila on the tapes seem to have been made in the furtherance of an underlying conspiracy. However, in making its ultimate determination that a conspiracy existed, the record reflects that the district court did not rely solely on the tapes themselves.

The district court relied on at least two items of independent evidence in making its determination that a conspiracy existed. The court considered the materials found at Avila's house after he was arrested and agreed to assist law enforcement agents in contacting Lopez–Gutierrez. Before attempting to contact Lopez–Gutierrez, Avila requested that the agents return to his house

in order to obtain a card containing the name and telephone number of his cocaine source. The agents did so and found a card with the name "Jesus" on it and two telephone numbers. When Avila dialed one of the numbers, a woman answered the phone. Avila then asked for "Jesus." Jesus Lopez–Gutierrez got on the line and engaged in a conversation with Avila relating to the sale of cocaine.[6] The card found at Avila's house containing Lopez–Gutierrez' name and telephone number was admitted into evidence and provided independent evidence of a conspiracy between Avila and Lopez–Gutierrez for the purchase and sale of cocaine.[7] Secondly, the taped conversations between Avila and Lopez–Gutierrez themselves were also admitted into evidence as independent evidence of a conspiracy.[8] The district court, during the *James* hearing, explicitly relied on the card and the Avila/Lopez–Gutierrez tapes in making its determination that a conspiracy existed by the preponderance of the evidence. We find no clear error in the district court's findings.

 Lopez–Gutierrez next argues that the district court erred in finding that he was a member of the conspiracy. We disagree. The evidence relied upon by the district court in making its determination that a conspiracy existed was also sufficient to show that Lopez–Gutierrez was a member of that conspiracy. Avila identified Lopez–Gutierrez as his source. The card found at Avila's house had Lopez–Gutierrez' name and telephone number on it, and Lopez–Gutierrez was identified as the person discussing a possible cocaine deal with Avila when Avila contacted Lopez–Gutierrez for law enforcement agents. Thus, we find Lopez–Gutierrez' membership in the conspiracy was established by a preponderance of the evidence.

 Finally, Lopez–Gutierrez argues that, even if the six recordings and transcripts were properly found to fit the coconspirator hearsay exception, the district court erred in finding that they were relevant to the case against him. He contends the transcripts contain references to another "Jesus" or "Jesse," an individual identified at trial as an international heroin dealer, and that such references were prejudicial and led to jury confusion.[9] Lopez–Gutierrez never objected to the tapes on this ground at trial. Thus, we review the district court's decision for plain error, and reverse only if the admission of the tapes undermined the fairness of the entire trial or if it affected one of Lopez–Gutierrez' substantial rights. *United States v. Hill*, 60 F.3d 672, 675 (10th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 432, 133 L.Ed.2d 347 (1995).

The record before us indicates that, while some of the transcripts contain references to another "Jesus," the government avoided any confusion by asking its witnesses to identify at trial who the other "Jesus" was. Therefore, we hold that it was not plain error for the district court to admit the Avila–CI tapes, and that the tapes were properly admitted as the non-hearsay statements of a coconspirator.

## C.

### Sufficiency of the Evidence

Lopez–Gutierrez claims the evidence presented at trial was insufficient to sustain his conviction for conspiracy to distribute cocaine. In reviewing such a challenge,

> we review the entire record in the light most favorable to the government to determine whether the evidence is such that a reasonable jury could find the defendant

---

6. Detective Andrews, who had known Lopez–Gutierrez for some seven years and had spoken to him approximately half a dozen times during those seven years, testified at trial that he had listened to the taped conversation between Avila and Lopez–Gutierrez and was able to identify Lopez–Gutierrez as the person speaking to Avila.

7. Testimony at trial indicated that Lopez–Gutierrez listed the same number found on the card as his home number at his place of employment.

8. Lopez–Gutierrez objected to these tapes on the grounds they were hearsay. The district court admitted the tapes over Lopez–Gutierrez' objection because they were not offered for the truth of what was in them, but rather to show the existence of a conspiracy between Avila and Lopez–Gutierrez.

9. This other "Jesus" or "Jesse" was Jesus Avila, Avila's brother.

guilty beyond a reasonable doubt. To the extent that the evidence conflicts, we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses. *United States v. Sapp,* 53 F.3d 1100, 1103 (10th Cir.1995) (internal quotation marks and citations omitted), *cert. denied,* — U.S. ——, 116 S.Ct. 796, 133 L.Ed.2d 744 (1996). We have held that the government must prove the following elements in order to sustain a conspiracy conviction: (1) there was an agreement to violate the law; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent. *United States v. Riggins,* 15 F.3d 992, 994 (10th Cir.1994). After reviewing the record as a whole, we conclude that a reasonable jury could find Lopez–Gutierrez guilty beyond a reasonable doubt of conspiracy to distribute cocaine.

First, the telephone conversations between Avila and the confidential informant reveal that Lopez–Gutierrez was part of a conspiracy to funnel cocaine from Garden City to Wichita. During the conversations, Avila states that his source is from Garden City and that his source has the ability and willingness to provide ten to twenty ounces of cocaine per week for resale. Lopez–Gutierrez was later identified as Avila's source after Avila was arrested and was asked to contact his source for law enforcement agents.

Second, the taped contacts between Avila and Lopez–Gutierrez establish the elements of a conspiracy. Avila told Lopez–Gutierrez that he had a buyer for twenty ounces of cocaine. Lopez–Gutierrez stated that $700 an ounce was "too cheap" but that Avila should travel to Garden City regardless of the outcome of the proposed $700 an ounce deal. He then asked whether Avila would have "buyers." During a second conversation, Avila stated that his buyer would pay $850 an ounce, and he inquired as to whether Lopez–Gutierrez would be willing to meet him half way between Garden City and Wichita, in Greensburg, Kansas. Lopez–Gutierrez stated that he could not travel to Greens-

burg and that Avila should meet him at his job in Garden City. Avila and law enforcement agents did so and Lopez–Gutierrez was arrested.

From this evidence, a reasonable jury could conclude that Lopez–Gutierrez willingly entered into an agreement to distribute cocaine with Avila. The evidence also demonstrates that Lopez–Gutierrez and Avila were interdependent in that Lopez–Gutierrez was the source of the cocaine which was ultimately sold by Avila, and Avila was Lopez–Gutierrez' link to the Wichita cocaine market. Consequently, we hold that the evidence presented at trial was sufficient to sustain Lopez–Gutierrez' conviction for conspiracy to distribute cocaine.

## II. GRAND JURY ABUSE

Lopez-Gutierrez argues that the grand jury's independence was unconstitutionally usurped by prosecutorial misconduct, and thus the district court should have granted his motion to dismiss the indictment. He contends the government failed to correct false evidence presented to the grand jury, and the government's grand jury witness impermissibly commented on his Fifth Amendment right to remain silent.

The determination as to whether an indictment should be dismissed due to prosecutorial misconduct before a grand jury is based on the following considerations. First, we must determine whether the claimed errors should be characterized as "technical" or "procedural" errors affecting only the grand jury's finding of probable cause, or whether the alleged errors are more properly characterized as threatening the defendant's "right to fundamental fairness in the criminal process." *United States v. Kilpatrick,* 821 F.2d 1456, 1466 (10th Cir. 1987), *aff'd sub nom. Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Where the alleged errors are technical violations affecting only the grand jury's finding of probable cause, "the defendant must have successfully challenged the indictment before the petit jury rendered a guilty verdict." *Id.* (citing *United States v. Mechanik,* 475 U.S. 66, 70,

106 S.Ct. 938, 941–42, 89 L.Ed.2d 50 (1986)). A petit jury's subsequent guilty verdict under these circumstances not only establishes there was probable cause to believe the defendant was guilty as charged, but also that the defendant was guilty beyond a reasonable doubt. *Mechanik,* 475 U.S. at 70, 106 S.Ct. at 941–42. "Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.*

 If, however, the claimed errors went " 'beyond the question of whether the grand jury had sufficient evidence upon which to return an indictment' " and essentially threatened the defendant's rights to fundamental fairness, the issue is justiciable notwithstanding a subsequent guilty verdict by the petit jury. *Kilpatrick,* 821 F.2d at 1466 (quoting *United States v. Taylor,* 798 F.2d 1337, 1340 (10th Cir.1986)). Conduct that might properly be characterized as transgressing a defendant's right to fundamental fairness would include, for example, an attempt by the government to "unfairly sway the grand jury ... [, or a] pervasive attempt to charge without cause or to undermine the defense." *United States v. Taylor,* 798 F.2d 1337, 1340 (10th Cir.1986). Under such circumstances, we review the record to determine whether the prosecutor engaged in "flagrant or egregious misconduct which significantly infringed on the grand jury's ability to exercise independent judgment." *Kilpatrick,* 821 F.2d at 1466 (citing *United States v. Pino,* 708 F.2d 523, 530 (10th Cir. 1983)).

 In the instant case, however, the errors by the government are more appropriately characterized as technical errors which, at most, could have affected only the grand jury's determination of probable cause. Lopez–Gutierrez' first claim of error is that the government allowed false evidence of the defendant's criminal history to be presented to the grand jury. During the grand jury proceeding, one of the grand jurors asked Special Agent Troy Derby ("Derby") whether Lopez–Gutierrez had ever been indicted for or tried for drug offenses in the past. Derby responded that he had, and mistakenly indicated that Lopez–Gutierrez had been convict-

ed of two separate offenses, one for cocaine and one for marijuana. In fact, while Lopez–Gutierrez had been arrested on cocaine and marijuana charges, he had only been convicted for marijuana offenses.

Derby testified under oath, however, that prior to testifying before the grand jury, he had a conversation with Garden City detective John Andrews. Derby stated that, based on this conversation, he was under the impression that Lopez–Gutierrez had been convicted previously of a cocaine offense as well as a marijuana offense. Derby further testified that he did not realize the error until approximately one week before trial, when he received authenticated copies of Lopez–Gutierrez' criminal record from Finney County. The district court denied Lopez–Gutierrez' motion to dismiss the indictment, ruling that there was no evidence to suggest that Derby's statements before the grand jury were deliberately false. We agree. Nothing in the record suggests that Derby intended to unfairly sway the jury or undermine Lopez–Gutierrez' defense. He was merely mistaken, and the statements were at most technically inaccurate and had the potential of affecting only the grand jury's finding of probable cause.

 Finally, Lopez–Gutierrez argues the indictment should have been dismissed because Derby impermissibly commented on his invocation of his Fifth Amendment right to remain silent. During his grand jury testimony, Derby was asked by one grand juror whether Lopez–Gutierrez had admitted involvement in either of the crimes he was charged with. Derby responded, "No, the night that we arrested him, he wouldn't talk to us. He asked for his attorney after we Mirandized him." Lopez–Gutierrez contends this testimony unconstitutionally biased the jury in its finding of probable cause. As we have already stated, the question of probable cause is mooted by a subsequent guilty verdict from the petit jury, unless the claimed errors go beyond affecting the probable cause determination and rise to the level of threatening the defendant's right to fundamental fairness. We find no such threat stemming from Derby's response to the grand juror. His reference to the fact that Lopez–Gutierrez had invoked his Fifth and Sixth amendment rights was a response to a

question posed by a grand juror and not an impermissible attempt to infringe on the ability of the grand jury to exercise its own independent judgment in determining whether there was probable cause. *See United States v. Edmonson,* 962 F.2d 1535, 1539 (10th Cir.1992) (holding, *inter alia,* that the government's comment before the grand jury regarding defendant's refusal to communicate with law enforcement officers after receiving his *Miranda* warning did not prevent the grand jury from exercising independent judgment concerning the indictment). Furthermore, no reference to Lopez–Gutierrez' refusal to speak to law enforcement agents was made at trial.

Based upon the foregoing discussion, we conclude that Lopez–Gutierrez' claims of error relating to the grand jury proceeding are appropriately characterized as technical errors potentially affecting only the grand jury's finding of probable cause. Because the petit jury returned a guilty verdict in this case, which we have determined was supported by sufficient evidence, the question as to whether there was probable cause to bring an indictment is moot.

### III. SENTENCE ENHANCEMENT

 Lopez–Gutierrez argues his sentence is illegal and should be vacated because the district court failed to comply with 21 U.S.C. § 851(b) when it imposed an enhanced sentence based on a prior conviction. The legality of Lopez–Gutierrez' sentence presents a question of law which we review *de novo. United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1484 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994).

 21 U.S.C. § 851(b) provides:

If the United States attorney files an information under this section, the court shall after conviction but before pronouncement of sentence inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

In this case, the government filed an Information Charging Prior Offense to be relied upon in enhancing Lopez–Gutierrez' sentence because Lopez–Gutierrez had a prior conviction for possession of marijuana. In the presentence report, the probation officer determined that, while the guideline range based on the offense level was 78 to 97 months, the enhancement would increase the guideline sentence in this case to 120 months, or ten years. After ascertaining that Lopez–Gutierrez had read the presentence report and had reviewed it with his attorney, and that there were no objections to the report, the district court adopted the guideline application in the report and sentenced Lopez–Gutierrez to 120 months imprisonment. The court, however, did not comply with 21 U.S.C. § 851(b) in that it neither inquired of Lopez–Gutierrez whether he affirmed or denied that he was previously convicted as set forth in the information, nor did the court inform him that any challenge to the prior conviction not made before imposition of sentence would be waived. After review of the record before us, we hold that the district court did erroneously fail to comply with the requirements of § 851(b). However, we hold such error to be harmless in this case. *See United States v. Gonzalez–Lerma,* 71 F.3d 1537, 1540–41 (10th Cir.1995) (holding that 21 U.S.C. § 851(b) is not jurisdictional, and thus a trial judge's failure to inform defendant of his opportunity to challenge a prior conviction which the prosecutor intends to use to enhance defendant's sentence is subject to harmless error analysis), *cert. denied,* —— U.S. ——, 116 S.Ct. 1341, 134 L.Ed.2d 490 (1996).

Lopez–Gutierrez neither argues that he would have raised a challenge to his prior conviction had he been warned by the district court pursuant to § 851(b), nor does he advise this court how such a challenge might be successful. In essence, he does not allege any prejudice stemming from the district court's omission. In addition, defense counsel conceded that Lopez–Gutierrez had been convicted of the marijuana offense during a pretrial hearing on Lopez–Gutierrez' motion to dismiss the indictment. This concession as to the validity of the prior offense, when coupled with the absence of any suggestion by Lopez–Gutierrez that the district court's omission prevented him from raising a specif-

ic challenge to his prior conviction, renders harmless the district court's failure to comply with § 851(b).

## CONCLUSION

The district court did not err in admitting 404(b) evidence, and the Avila–CI tapes were properly admitted as the non-hearsay statements of a coconspirator. This evidence, along with the other evidence presented at trial, was sufficient to sustain Lopez–Gutierrez' conviction for conspiracy to distribute cocaine. With respect to the claimed errors in the grand jury proceeding, we hold that they could have affected only the grand jury's determination of probable cause and that the subsequent guilty verdict by the petit jury rendered this issue moot. Finally, while we hold the district court erred in not complying with 21 U.S.C. § 851(b) in enhancing Lopez–Gutierrez' sentence, we conclude that the error was harmless under the circumstances. We do not reach Lopez–Gutierrez' argument that the cumulative effect of error throughout trial justify reversal of his conviction because we find insufficient error to warrant such an inquiry. We therefore **AFFIRM** his conviction and sentence.