F I L E D
United States Court of Appeals
Tenth Circuit

MAR 6 1998

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CARLOS M. RENDEN, aka Carlos
Renden-Ruiz; aka Carlos Renvon; aka
Carlos Rendon,

      Defendant - Appellant.

No. 96-3423
(D.C. No. 95-CR-10009-12)
(District of Kansas)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **BRISCOE** and **LUCERO**, Circuit Judges.

---

Defendant, currently in federal custody, appeals his conviction for one

count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. Mr.

Renden asserts three grounds of appeal: (1) that the district court erred in

allowing the government to introduce evidence concerning his prior arrest and

conviction for cocaine distribution; (2) that the government failed to present

sufficient evidence to convict him of conspiracy; and (3) that the district court

---

[*]   This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

erred in failing to reduce his offense level pursuant to U.S.S.G. § 3B1.2. We affirm.

## I

This case involves a complex drug distribution scheme involving the use of Toyota minivans to transport large quantities of cocaine primarily from Los Angeles to New York. Because the defendant argues the record is insufficient to sustain his conviction, we engage in a thorough recitation of the evidence adduced at trial.

On January 21, 1995, Trooper Greg Jirak of the Kansas Highway Patrol stopped a Toyota Previa minivan driven by Jesus Solis-Arenas. Rosa Imelda Gonzales was riding as a passenger in that vehicle. A search of the minivan uncovered 111 packages of cocaine hidden in a secret compartment under the interior floor of the vehicle. Two days later, Lazaro Saez and Mirta Gomez were stopped in Tennessee in a different Previa minivan. That vehicle was found to contain in excess of 100 kilograms of cocaine in a similar compartment. The defendant was convicted of conspiring with the occupants of those vehicles and with others to participate in a large-scale cocaine distribution organization.

At trial, the evidence demonstrated that Thelma Wingist controlled the organization with the assistance of a man known only as Fernando. Wingist testified that she had started dealing cocaine in Miami, Florida. When Wingist's

organization expanded to California, she contacted the defendant. At their first meeting, she gave him the key to a minivan and an address to which the vehicle was to be delivered. Later, the defendant called Wingist and told her that the van was ready to drive to New York.

Mirta Gomez testified that she had made approximately ten or eleven trips from Los Angeles to New York, transporting cocaine between the two cities. According to Gomez, she met the defendant at a travel agency owned by Alberto Rosas, another co-conspirator. At that initial meeting, Gomez gave Renden the keys to one of the minivans so that it could be loaded with cocaine for one of her cross-country trips. Renden waited with her while the van was being loaded. Gomez also testified that she gave the keys to a minivan to Renden on a second occasion. She stated that she told Renden where she was staying and that the van was delivered to her hotel after it had been loaded. Gomez did not see who delivered the van.

Rosa Imelda Gonzales was recruited to join the conspiracy by Wingist. Gonzales's function, like Gomez's, was to drive the loaded vans from Los Angeles to New York. Gonzales testified that she would use a beeper to contact a man named "Zapato" when she was ready to take one of the loaded vans across the country. She was instructed on how to contact "Zapato" by Wingist. According to Gonzales, "Zapato" was responsible for loading the minivans with

cocaine in preparation for the cross-country trips. Wingist later testified that "Zapato" was a name used to identify the defendant. Gonzales also testified that she had gone to the defendant's flower shop to pick up a loaded van on at least one occasion.

Alberto Rosas testified that he first met Renden when Renden employed his services as a travel agent. Rosas stated that he first became involved in the conspiracy in 1993. He further testified that Renden told him that his "friends . . . travel a lot between California and New York and Miami" and that Renden was supposed to take their vans to a mechanic every time they returned to California. R., Vol. IV, at 446. Rosas later testified that, although Renden never explicitly told him that they were transporting cocaine across the country, Rosas understood that taking a van to the "mechanic" included the process of loading the van with either cocaine or money.

Finally, the government offered testimony from Thomas Sanchez Cruz, who testified that Renden recruited him to participate in the drug distribution conspiracy. According to Sanchez, Renden asked him for his beeper number so that Renden could distribute it to the other members of the conspiracy. Thereafter, the co-conspirators would contact Sanchez when they wanted a van loaded with cocaine. In addition, Sanchez testified that Renden asked him explicitly to find a house to store drugs, see R., Vol. IV, at 515; R., Vol. V, at

538, after which Sanchez made an arrangement with Rosas to use the garage of Lordus Mayorga, Rosas's mistress, to store over 400 kilograms of cocaine. According to Sanchez, he only became involved with the loading and storage of cocaine at the direction of Renden.

## II

Over defense objection, the government offered the testimony of Alberto Rosas that he and Renden had been arrested while attempting to deliver two kilograms of cocaine to a private residence in Rancho Santa Margarita, California. Renden contends that his prior conviction is outside the scope of his alleged role in the conspiracy and is therefore subject to Rule 404(b) of the Federal Rules of Evidence. He argues it was error to admit this evidence because: (1) the government failed to give the required notice that it planned to introduce 404(b) evidence, see United States v. Lopez-Gutierrez, 83 F.3d 1235, 1241 (10th Cir. 1996); (2) neither the government nor the district court identified the specific reason under Rule 404(b) for admitting the evidence, see United States v. Cardall, 885 F.2d 656, 671 (10th Cir. 1989); and (3) there is no appropriate purpose under Rule 404(b) for which this evidence should have been admitted. The government argues that Renden's prior attempt to distribute cocaine was direct evidence of the conspiracy alleged and thus was properly admitted. See United States v. Pace, 981 F.2d 1123, 1135 (10th Cir. 1992). We review the district court's decision to

admit such evidence for abuse of discretion.  See United States v. Kimball, 73 F.3d 269, 271 (10th Cir. 1995).

The defendant does not dispute that "[c]onduct during the life of a conspiracy that is evidence of the conspiracy is not Rule 404(b) evidence." Pace, 981 F.2d at 1135.  Rather, he contends that the facts surrounding his prior arrest and conviction are so incongruous with the government's theory of his role in the charged conspiracy that it was an abuse of discretion to admit them as direct evidence of the charged conspiracy.  We disagree.

The indictment in this case charges the defendant with making "arrangements for the distribution of large quantities of cocaine which included . . . making deliveries of cocaine and accompanying other couriers to assist in the delivery of cocaine to various locations throughout the United States."  R., Vol. I, Doc. 336, at 2-3.  Renden's prior conviction involves the delivery of cocaine, the controlled substance identified in the indictment.  The timing of the arrest, in December of 1993, is within the time frame charged in the indictment.[1]  In addition, the defendant was acting in concert with another co-conspirator at the time of his prior arrest.  Although not sufficient itself to establish the defendant's

---

[1]   The indictment charged Defendant with participating in a conspiracy "[f]rom in or about January of 1992 to on or about February 1, 1995."  R., Vol. 1, Doc. 336, at 1.

-6-

participation in the large-scale conspiracy, we cannot conclude that the district court abused its discretion in admitting the disputed evidence.

**III**

The defendant also claims that the government failed to present sufficient evidence to support his conspiracy conviction. We review such claims de novo. See United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997). "'Evidence is sufficient to support a conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with the reasonable inferences therefrom, taken in a light most favorable to the government.'" Id. (quoting United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)).

The government must present sufficient evidence on the following four elements in order to sustain a conviction for conspiracy: (1) the defendant and one or more persons agreed to violate the law; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily became involved with the conspiracy; and (4) interdependence existed among the alleged co-conspirators. United States v. Nieto, 60 F.3d 1464, 1469 (10th Cir. 1995) (citing United States v. Johnson, 12 F.3d 1540, 1545 (10th Cir. 1993)). "Conspiracy cases may be proven exclusively by circumstantial

evidence." United States v. Troutman, 814 F.2d 1428, 1446-47 (10th Cir. 1987) (citing United States v. Henry, 468 F.2d 892 (10th Cir. 1972)).

## A

In order to sustain a conspiracy conviction, there must first be sufficient evidence of an agreement between the defendant and at least one other person to violate the law. See Nieto, 60 F.3d at 1469. The defendant does not contest that the government established the existence of a conspiracy; he merely claims the government has failed to prove he joined it. In order to demonstrate that the defendant entered into an agreement, the government must show more than mere association with the alleged co-conspirators. See United States v. Evans, 970 F.2d 663, 669 (10th Cir. 1992). In this case, there is ample evidence that Renden entered into an agreement.

Wingist, Gomez, and Gonzales each testified that they contacted the defendant to arrange for the loading of cocaine and delivery of loaded minivans. Rosas testified that the defendant had told him that he had "friends" who frequently traveled across the country and that he would assist them by taking their vans to a "mechanic" upon their arrival in Los Angeles.[2] R., Vol. IV, at 446. Finally, Sanchez testified that the defendant recruited him to participate in the

---

[2] Rosas further testified that he understood this statement to mean that the minivan was being loaded with cocaine for transport.

conspiracy and that he had arranged for the storage of cocaine at the defendant's request. Taking all inferences in the light most favorable to the government, see Wilson, 107 F.3d at 778, the evidence is more than sufficient to support the jury's finding that the defendant entered into an agreement with the other co-conspirators.

**B**

The government must also prove that the defendant knew the central objectives of the conspiracy and that he knowingly and voluntarily joined. See Nieto, 60 F.3d at 1469. In order to support the defendant's conviction, the evidence must sufficiently establish that the defendant shared a common objective with the other co-conspirators. See Evans, 970 F.2d at 669. The government need not show that the defendant interacted with every other co-conspirator; rather, the government need only show that the defendant knew a conspiracy existed and voluntarily joined. See id. To show knowing and voluntary involvement, the government must demonstrate that the defendant had a general awareness of both the scope and objective of the conspiracy. See id. In conspiracy cases, a "'defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances.'" United States v. Carter, 130 F.3d 1432, 1440 (10th Cir. 1997) (quoting United States v. Christian, 786 F.2d 203, 211 (6th Cir. 1986)).

The defendant has never challenged the existence of a conspiracy to distribute cocaine. Rather, the defendant's consistent position, both at trial and on appeal, is that he never knowingly and voluntarily entered the conspiracy charged in the indictment. He argues that none of the witnesses testified that they saw him handling cocaine on the scale alleged in the indictment and that there is no evidence creating an affirmative link between him and the large-scale distribution of cocaine. We disagree.

There is sufficient evidence in the record to establish the defendant's awareness of the nature and scope of the charged conspiracy. First, the defendant told Rosas that he would take the minivans to the "mechanic" to be serviced for the cross-country trips, a process that Rosas later understood to include loading the minivans with cocaine. Second, the testimony of Thomas Sanchez Cruz indicates that the defendant recruited him to join the conspiracy and that Sanchez only became involved with the loading and storage of cocaine at the direction of the defendant. Sanchez testified that the defendant personally distributed Sanchez's pager number to other co-conspirators who then used it to contact Sanchez so that he could load the minivans with cocaine. Sanchez's testimony also states that the defendant requested Sanchez to store drugs for him, after which Sanchez arranged for the storage of over 400 kilograms of cocaine at the

home of Lordus Mayorga. From this testimony, the jury could reasonably have found that the defendant knew the nature and scope of his request.

In addition, the testimony at trial indicated that the drug couriers would contact the defendant by pager when they needed to have a van loaded with cocaine. The co-conspirators employed a method of entering codes on the beeper so the defendant would know that the signal was genuine. The defendant would then take control of the minivan and it would later be returned to the courier after it had been loaded. Sanchez testified that the defendant explained this precise method to him when the defendant recruited him to join the conspiracy. From that testimony, it is reasonable for the jury to infer that the defendant knew what role he was asking Sanchez to play in the cocaine distribution scheme. In the light of all of the above evidence, it is reasonable for the jury to have concluded that the defendant knew that the central objective of the conspiracy was the large-scale distribution of cocaine and that the defendant was a voluntary and knowing participant.

## C

The government must also produce sufficient evidence of "'the essential element of interdependence' among the co-conspirators." United States v. Fox, 902 F.2d 1508, 1514 (10th Cir. 1990) (quoting United States v. Dickey, 736 F.2d 571, 582 (10th Cir. 1984)). "[I]nterdependence exists where each [co-

conspirator's] activities constituted essential and integral steps toward the realization of a common, illicit goal." United States v. Edwards, 69 F.3d 419, 431 (10th Cir. 1995) (internal quotations omitted). The defendant argues that the government failed to establish interdependence because it failed to demonstrate that the co-conspirators "act[ed] *together* for their *shared mutual benefit* within the scope of the conspiracy charged." Evans, 970 F.2d at 671. The defendant asserts that Evans requires the government to show that the defendant benefitted financially from his role in the conspiracy. Thus, the defendant argues, the evidence is insufficient to establish his involvement in the conspiracy because the government failed to show that the defendant benefitted in any way.

The defendant misinterprets our decision in Evans. The evidence need not demonstrate that the defendant received a financial benefit for the role that he played. Rather, the evidence need only demonstrate that the defendant played an essential role in the furtherance of the goals of the conspiracy. That the defendant was not apparently rewarded for his efforts is not dispositive. It is clear that the success of the conspiracy required someone to store large quantities of cocaine and load it onto the minivans when the couriers were ready. When the defendant was no longer able to fill this role, he recruited Thomas Sanchez Cruz. The role played by the defendant was integral to achieving the goals of the

conspiracy and the evidence clearly demonstrates the required interdependence among the co-conspirators. See Edwards, 69 F.3d at 431.

## IV

The defendant's final ground for appeal is that the district court erred in failing to reduce his sentence under U.S.S.G. § 3B1.2, which allows the district court to grant a two to four level reduction to defendants who played "minor" or "minimal" roles in the commission of the charged offense. We review the district court's finding that the defendant was neither a "minor" nor a "minimal" participant for clear error. See United States v. Ayers, 84 F.3d 382, 383 (10th Cir. 1996). The burden is on the defendant to show that he is entitled to a reduction under § 3B1.2. See id. Clear error is shown if the district court's finding is without support in the record or if, after reviewing the record, we are left with the firm conviction that a mistake has been made. Cowles v. Dow Keith Oil & Gas, Inc., 752 F.2d 508, 511 (10th Cir. 1985).

Section 3B1.2 of the Sentencing Guidelines "'vests the district court with discretion to grant a base offense level reduction if it finds a defendant is less culpable relative to other participants in a given offense.'" Ayers, 84 F.3d at 383 (quoting United States v. Santistevan, 39 F.3d 250, 254 (10th Cir. 1994)). The commentary to section 3B1.2 indicates that "the downward adjustment for a minimal participant will be used infrequently." U.S.S.G. § 3B1.2, commentary

(n.2).  As an example of a "minimal" participant, the commentary describes a participant in a "very large drug smuggling operation" whose only role was "to offload part of a single marihuana shipment, or . . . an individual [who] was recruited as a courier for a single smuggling transaction involving a small amount of drugs."  Id.  A minor participant means anyone who does not qualify as a minimal participant but who is still less culpable than most other participants.  See id., commentary (n.3).

We find no clear error.  The district court determined that the defendant "participated on an equal footing with most of the others involved in this offense;" that he loaded and transported vans on more than one occasion; that he had a full knowledge of the scope of the conspiracy; and that he "recruited Thomas Sanchez to find a place to store large amounts of cocaine."  R., Vol. I, Doc. 490, at 1-2.  Such findings are supported by the record and justify denial of a reduction under § 3B1.2.

AFFIRMED.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge