**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JAMIE HARMON,
*Defendant-Appellant.*

No. 15-10034

D.C. No.
5:08-cr-00938-LHK-2

OPINION

Appeal from the United States District Court
for the Northern District of California
Lucy H. Koh, District Judge, Presiding

Argued and Submitted June 13, 2016
San Francisco, California

Filed August 18, 2016

Before: J. Clifford Wallace, Dorothy W. Nelson,
and John B. Owens, Circuit Judges.

Opinion by Judge Owens

## SUMMARY[*]

### Criminal Law

Affirming convictions for money laundering, the panel held that a prosecutor's failure to correct false testimony before a grand jury and failure to disclose impeachment information about a grand jury witness – even if done intentionally – do not constitute structural error requiring automatic reversal, but are harmless as a matter of law after a petit jury returns a guilty verdict.

The panel explained that *United States v. Mechanik*, 475 U.S. 66 (1986), makes clear that something other than dismissal – such as a state bar inquiry or an investigation by the Office of Professional Responsibility – is the proper recourse under the facts of this case.

The panel held that the prosecution's asking the district court ex parte at trial to decide in camera whether the witness's informant activity need be disclosed was not improper.

### COUNSEL

August Gugelmann (argued) and Edward Swanson, Swanson & McNamara LLP, San Francisco, California, for Defendant-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Anne M. Voigts (argued), Assistant United States Attorney; Barbara J. Valliere, Chief, Appellate Division; Brian J. Stretch, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

## OPINION

OWENS, Circuit Judge:

Defendant-Appellant Jamie Harmon appeals from her convictions for money laundering. She argues that the prosecutor's errors before the grand jury constitute structural error, requiring reversal. She also contends that the government's failure to disclose impeachment evidence about a hostile defense witness mandates a new trial. Because the grand jury errors are not structural, and any impeachment evidence immaterial, we agree with the district court's well-reasoned analysis and affirm.

## I.  Factual and Procedural Background

To make a long and convoluted story short: Christian Pantages ran a business that resold stolen computer equipment as legitimate. He was charged in state court with receiving stolen property, and retained Harmon as his criminal defense attorney. Fearing that his bank accounts were frozen, Pantages searched for a way to access the funds derived from his stolen computer equipment scheme. His solution was his attorney, Harmon.

### A.  The Grand Jury Investigation

Pantages delivered two checks to Harmon totaling $127,550, and she deposited them into her client-trust account.  Harmon then wrote multiple checks back to Pantages and his wife totaling around $100,000 within six weeks of receiving the two checks from Pantages.  Harmon pocketed the remaining funds.  The parties agree that the funds came from a specific unlawful activity, as the money laundering statute requires.  The parties disagree whether Harmon knew that important fact.

As part of its investigation into Harmon and her transactions with Pantages, the government called three witnesses before the grand jury: (1) a federal agent who traced the checks and provided an overview of the investigation; (2) a civil attorney who had suspicious interactions with Harmon; and (3) Yan Ebyam.[1]  Ebyam, the former business partner of Pantages, previously had pled guilty to money laundering charges arising from the stolen computer scheme.  He testified three times about his interactions with Harmon, including an alleged conversation where he made it clear that all funds from Pantages came from illegal activity.[2]

---

[1] The astute reader will note that "Yan Ebyam" is a play on "Yes and No, Maybe."  *Cf.* Star Trek, *All Our Yesterdays* (first aired March 14, 1969) (introducing viewers to "Mr. Atoz," the last resident of planet Sarpeidon and a shifty librarian).

[2] Hollywood could turn this into "Breaking RAM," with Pantages and his wife as Walter and Skyler White, Ebyam as Jesse Pinkman, and Harmon as Saul Goodman.

Ebyam's plea agreement – which governed his grand jury testimony – set out his obligation to cooperate with the government before and after his sentencing. In exchange for this cooperation, the government agreed to not seek any additional charges against Ebyam. However, if Ebyam did not cooperate, the government could seek more charges, as Ebyam agreed to waive any statute of limitations defenses. Ebyam also began working as a paid government informant in unrelated investigations.

The grand jurors were curious about Ebyam's relationship with the prosecution. At his first grand jury session (and apparently due to a grand juror's concern), the prosecutor asked Ebyam if he had received any promises or benefits in exchange for his testimony. Ebyam said he had no obligation to testify, as he had been sentenced and had served his time. He explained that he was testifying voluntarily because he "want[ed] to be a member of society" again. Neither the prosecutor nor Ebyam mentioned the plea agreement's requirement that he cooperate after sentencing or possibly face additional charges.

At his second session, the prosecutor asked Ebyam if he was testifying on his own accord. Ebyam stated that he was under no obligation to cooperate, and again there was no mention of the plea agreement.

At his third session, a grand juror asked Ebyam: "What are you doing now?" The prosecutor stepped in before Ebyam could answer and posed a different question: "Are you receiving any benefit from your cooperation with the government, either for your testimony today or any other type of testimony on this particular case?" Ebyam answered: "I'm

not under indictment. I'm not getting any paychecks . . . . there's no secret benefit down the line."

The prosecutor never informed the grand jury that Ebyam's plea agreement explicitly required him to testify before the grand jury, and that if he refused to do so, he risked facing additional charges. The prosecutor also never informed the grand jury that Ebyam was a paid informant for unrelated government investigations. The government concedes that the prosecutor should have corrected Ebyam to make clear to the grand jury that the plea agreement obligated this testimony.

The grand jury returned an indictment against Pantages and Harmon for money laundering charges. Pantages pled guilty and agreed to cooperate against Harmon. Harmon stood tall.

After the indictment, Harmon filed a motion seeking dismissal of the indictment based on prosecutorial misconduct related to Ebyam's testimony. Judge Ware denied the motion.

## B. The Trial

The government's witnesses included: (1) Pantages, who had turned against Harmon and revealed numerous damaging conversations and transactions;[3] (2) a Deputy District

---

[3] Pantages testified that during one of his meetings with Harmon, he told her he did not know how to cash the two checks because he thought his account was frozen. Pantages said Harmon suggested depositing the checks into her client trust account and returning the proceeds to Pantages.

Attorney who informed Harmon about the illegal nature of Pantages's business during the state court prosecution for receipt of stolen goods; (3) Pantages's wife, who testified about some conversations and transactions with Harmon; and (4) Harmon's office assistant, who described how Harmon's financial transactions with Pantages were not the norm. It was a strong case for the prosecution.

About a week prior to trial before Judge Ware, the defense listed Ebyam as an "impeachment" witness. And shortly before the defense called Ebyam, the government filed an ex parte application for in camera review of the additional impeachment information about Ebyam – whether Ebyam's ongoing work as a paid informant needed to be disclosed. The government contended that disclosure: (1) would endanger Ebyam; (2) was unnecessary because the impeachment was unrelated to Harmon's prosecution; and (3) was barred by privilege under *Roviaro v. United States*, 353 U.S. 53, 59 (1957). The court never ruled on the application, and defense counsel cross-examined Ebyam without knowing this additional impeachment information. However, defense counsel impeached Ebyam with: (1) his own criminal conduct; (2) his cooperation agreement (under which the government could seek additional charges if Ebyam failed to live up to his side of the deal); (3) his erroneous testimony before the grand jury about his obligations under the plea agreement; and (4) a previous

---

After Pantages signed the checks over to Harmon, she returned almost $100,000 over the next six weeks. Harmon issued checks in the following amounts to Pantages's wife: $15,000, $10,000, $10,000, $10,000. Harmon also wrote a check to Pantages for $54,000 and suggested he go to her personal banker and have the check broken into smaller amounts and issued as cashier's checks.

incident of dishonesty before a court (a state court judge found that Ebyam had lied about aspects of his personal finances).

The jury returned guilty verdicts on five counts of money laundering (18 U.S.C. § 1956(A)(1)(b)(I)), but hung on the conspiracy to commit money laundering charge (18 U.S.C. § 1956(h)).

### C.  Post-Trial Motions to Vacate Convictions[4]

Post-trial, Harmon brought two motions relevant to this appeal.  First, Harmon argued that the prosecutor's actions before the grand jury required dismissal of the indictment. Harmon contended that the prosecutor's failure to correct Ebyam's false testimony that he was free not to cooperate with the government was structural error, not subject to harmless error review.  After examining decisions like *United States v. Mechanik*, 475 U.S. 66 (1986), and *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), Judge Koh (having replaced the since retired Judge Ware) concluded that the alleged error did not fall into the narrow category of structural error, and even if it could be reviewed for harmfulness after a jury verdict, it was harmless in light of the other evidence presented to the grand jury.

---

[4] Harmon initially argued that an indictment obtained through knowingly perjured testimony violated due process.  Judge Ware rejected that argument, but then sua sponte granted Harmon a new trial based on an erroneous jury instruction. Our court reversed that decision and reinstated the convictions, as any instructional error was harmless.  *United States v. Harmon*, 537 F. App'x 719, 720 (9th Cir. 2013) (unpublished).  Our court did not decide whether a new trial was warranted due to any prosecutorial misconduct before the grand jury.

Harmon next argued that the government's failure to disclose Ebyam's status as a paid informant violated *Brady v. Maryland*, 373 U.S. 83 (1963), as defense counsel could have used that information to attack Ebyam's motives and credibility, and therefore call the guilty verdict into doubt. Judge Koh rejected that argument, reasoning that: (1) defense counsel had ample evidence to impeach Ebyam; and (2) "there was extensive evidence of Harmon's guilt that was entirely independent of Ebyam's testimony."

Judge Koh sentenced Harmon to 24 months in prison, and three years of supervised release. Harmon then appealed.

## II. Discussion

### A. Standard of Review

This court reviews de novo a district court's order denying a motion to dismiss an indictment based on prosecutorial misconduct. *See United States v. Fuchs*, 218 F.3d 957, 964 (9th Cir. 2000).[5]

This court "review[s] de novo a district court's denial of a new trial motion based on a *Brady* violation." *United States v. Rodriguez*, 766 F.3d 970, 980 (9th Cir. 2014).

---

[5] The parties frequently discuss prosecutorial misconduct during grand jury proceedings in the context of the Rule 33 motion for a new trial. Because Harmon is asking for us to dismiss the indictment, rather than for a new trial, we construe this as an appeal of her motion to dismiss the indictment.

## B. The Prosecutor's Actions Before the Grand Jury

The parties agree that the prosecutor's actions before the grand jury – not correcting false testimony – were wrong. But errors concerning evidence presented to the grand jury cannot trigger dismissal of charges or a new trial when a subsequent petit jury returns a verdict of guilty. *See Mechanik*, 475 U.S. at 70 (after a conviction, "any error in the grand jury proceeding connected with the charging decision [is deemed] harmless beyond a reasonable doubt" as a matter of law); *United States v. Caruto*, 663 F.3d 394, 402 (9th Cir. 2010) ("[B]ecause Caruto was subsequently found guilty by the petit jury based on proof beyond a reasonable doubt[,] [t]he alleged [grand jury] error was . . . rendered harmless by Caruto's subsequent conviction.").

To bypass *Mechanik*, Harmon argues that the prosecutor's errors were so grave that they were structural and required dismissal of all charges. While we agree that the prosecutor's actions were wrong (and may warrant further inquiry by other bodies),**[6]** we also agree with the district court they were not structural.

"[M]ost constitutional errors can be harmless . . . Only in rare cases has [the Supreme Court] held that an error is structural, and thus requires automatic reversal." *Washington v. Recuenco*, 548 U.S. 212, 218 (2006) (internal quotation marks and citation omitted). In the grand jury context, the only identified structural error to date is discrimination on

---

**[6]** The now former Assistant United States Attorney who appeared before the grand jury also was part of the trial team. Our concerns are limited to him – we do not have concerns about his fellow trial counsel.

account of race or sex in the selection of grand jurors. *See Bank of Nova Scotia*, 487 U.S. at 257. This error – which concerns the composition of the grand jury – is structural, as it "permeate[s] 'the entire conduct of the [proceeding] from beginning to end,'" and cannot be "quantitatively assessed in the context of other evidence presented in order to determine whether [the error] was harmless beyond a reasonable doubt." *Campbell v. Rice*, 408 F.3d 1166, 1171–72 (9th Cir. 2005) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 309–10 (1991)).

Neither the failure to: (1) correct false testimony affecting a witness's credibility nor (2) disclose impeachment information falls into this narrow structural category that requires automatic reversal. We previously held in *United States v. Sitton*, 968 F.2d 947, 954 (9th Cir. 1992), *abrogated on other grounds by Koon v. United States*, 518 U.S. 81 (1996), that "[p]resentation of perjured testimony to the grand jury is not such a structural flaw." We reasoned that "[d]ismissal of the indictment is not appropriate when a witness' alleged perjury is not material to the defendant's indictment and instead affects only the witness' credibility." *Id.* at 953 (citation omitted). It was not structural because it is "an error susceptible of quantitative assessment to determine its effect, and therefore suitable for harmless error analysis." *Id.* at 954.

The prosecutor's errors here are also subject to quantitative assessment. Under *Mechanik*, presenting false information to the grand jury affecting a witness's credibility and withholding impeachment information – even if done intentionally, which we assume but do not decide – are harmless as a matter of law after a petit jury returns a guilty verdict. Harmon cites no post-*Mechanik* authority to the

contrary. We hold that where the intentional misconduct by the prosecution goes to a witness's credibility, it is not structural error.[7] While we share concerns that our holding could encourage prosecutorial misconduct, *Mechanik* makes clear that something other than dismissal – such as a state bar inquiry or an investigation by the Office of Professional Responsibility – is the proper recourse under these facts.

## C. The Prosecution's Actions At Trial

The prosecution's actions at trial – asking the district court ex parte to decide in camera whether Ebyam's informant activity need be disclosed – were not improper. We have previously upheld the practice of submitting impeachment material to the district court for in camera review. *See, e.g.*, *United States v. Dupuy*, 760 F.2d 1492, 1501 (9th Cir. 1985) ("By submitting the issue to the judge, the prosecutor satisfied her duty to disclose exculpatory material."); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 60

---

[7] Harmon leans on decisions of the Second and Tenth Circuits for support, but the cases are not inconsistent with our decision. In *United States v. Lombardozzi*, the Second Circuit recognized that "[d]ismissal of an indictment following a conviction is an 'extraordinary' remedy," and is warranted when "the prosecutor's conduct [must] amount[] to a knowing or reckless misleading of the grand jury as to an essential fact." 491 F.3d 61, 79 (2d Cir. 2007) (quoting *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989)). Here, the prosecution's misconduct, which potentially affected Ebyam's credibility, did not mislead the jury as to an essential fact. In *United States v. Lopez-Gutierrez*, 83 F.3d 1235 (10th Cir. 1996), the Tenth Circuit characterized the government's failure to correct false evidence presented to the grand jury as "technical error[s]" rendered harmless by a guilty verdict and not "flagrant or egregious misconduct which significantly infringed on the grand jury's ability to exercise independent judgment." *Id.* at 1245 (quoting *United States v. Kilpatrick*, 821 F.2d 1456, 1466 (10th Cir. 1987)). The same is true here.

(1987) (explaining that a defendant's rights "can be protected fully by requiring that [*Brady* material] be submitted only to the trial court for *in camera* review"). As is reflected under the facts here, this procedure is "particularly appropriate when the Government has legitimate reasons for protecting the confidentiality of the material requested." *Dupuy*, 760 F.2d at 1501. While the prosecution should have reminded the district court about the under seal filing and asked for a ruling, we cannot fault the initial procedure that it undertook.

And even assuming that Harmon had a right to impeachment information about a witness that she called – something we do not decide here – Harmon was not prejudiced by the prosecution's failure to reveal this information. *See Brady*, 373 U.S. at 88. We agree with the district court that any impeachment value was immaterial for two reasons.

First, Ebyam was impeached by other evidence. The defense attorney did a good job showing how Ebyam's testimony was bought and paid for through his cooperation agreement. The additional impeachment evidence – that he was a paid informant on unrelated matters – would have added little. Moreover, defense counsel showed that Ebyam was a convicted money launderer who was found to have previously lied in court. *See, e.g.*, *Rodriguez*, 766 F.3d at 989 (rejecting *Brady* claim where witness's "credibility was sufficiently undermined by the defense, given his admitted cooperation with the prosecution, his extensive criminal history, and his illicit prison activities"). In sum, this impeachment evidence was overkill.

Second, as Judge Koh correctly held, the evidence against Harmon was "extremely strong." The fact that Ebyam, called by the defense after the prosecution rested its case, was a paid informant could not have altered the jury's perception of what Harmon had done. *See, e.g.*, *United States v. Si*, 343 F.3d 1116, 1123 (9th Cir. 2003) (rejecting *Brady* claim based on impeachment evidence about witness because evidence was immaterial as witness was extensively cross-examined regarding his criminal activities and agreement with the government, and the witness's testimony was not the linchpin of the government's case). If there was any "linchpin" in this case, it was Pantages and his damning bank account transactions with Harmon, and not Ebyam. Any information concerning Ebyam's informant status was therefore immaterial.

**AFFIRMED.**